The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good afternoon. Welcome to the Chambers Courthouse here in Pasadena. It's a pleasure to be here with my colleagues. This is a timed set for the case of the United States of America v. State of Idaho. If the counsel are ready to proceed, you may come forward. As you come forward, I want to just check with Judge Gould to see if he can hear me. Yes, I can hear you perfectly. Thank you, Judge Gould. You may begin. Good morning, Your Honors. John Birch on behalf of Idaho. I'm dividing my time evenly with counsel for the legislature, and I will attempt to reserve three minutes for rebuttal. I will press three points today. First, the federal government cannot preempt state law by paying private parties to violate it. Second, the United States lacks a cause of action here, where EMTALA authorizes equitable relief only for private parties, not the United States, and only against Medicare hospitals, not non-participating states. And third, EMTALA mandates that doctors care for a pregnant mother's unborn child, undercutting any argument that EMTALA mandates abortion, especially given the multiple clear statement canons that apply here. The court should reverse this. Let me just ask you, the first few arguments you made, did you make those at the district court? The arguments have been preserved. The private party service, it makes it that it was the private parties and the servicing of the private parties that impinged on the state's right. Did you make that argument? I believe that the arguments regarding the spending clause and the cause of action have been preserved. They were even presented in the application to the U.S. Supreme Court. And Justice Kagan mentioned that it wasn't preserved. I was not Kagan. It was Barrett who said it wasn't preserved. And the district court said that a footnote, 935, was not enough. Those are your first two arguments. If we believe that you did not preserve those, then I gather this is the wrong forum in which to raise them, right? Well, let's start with spending clause. So it was raised in a footnote in the very first brief that, you know, under time constraints. In the motion for reconsideration, it was set forth at greater length. It appeared again at every step of the way, on the way up the chain, including in the application to the U.S. Supreme Court. The justices decided to take only the merits question and not the threshold question. But Justice Barrett, in her plurality opinion, directed the lower court to address the spending clause question. Okay, but it hasn't been addressed yet. It has not been addressed by the court yet, correct. You know, the question that I would have is, we're a court of appeals. We don't have fact-finding abilities and so on. Isn't this the kind of question that should be considered before Judge Wynn-Mallott rather than before us? I'm not even thinking of the spending clause issue. There are no factual disputes when it comes to the spending clause. It's a sheer question of why the Supreme Court justices were able to discuss it at length during the argument, but they chose to allow this court to address it first. When you consider the irreparable harm to Idaho of having its law enjoined every day as well as the harm to mothers and unborn children who are not being protected the way Idaho's law intends, I don't think we can afford to delay to go back to the district court. As I understand the state's argument, you say that Impala and Section 622 are not in conflict. Is that right? That's our position, yes. Okay, then what's the problem with having an injunction since you're not being harmed by the non-conflict from your perspective? Well, at a minimum, the injunction is even broader than what Impala states. The language of it is that doctors can perform any procedure necessary to avoid an emergency condition, which is not Impala's standard, which is necessary to assure no material deterioration. Well, let's assume a hypothetical. I don't want to take the time for my colleagues because I'm sure everyone has questions, but let's assume for a moment that a doctor is treating a woman, and in good faith the doctor believes that unless an abortion is performed, that the woman will lose one of her limbs. But she won't die. Under 622, would the doctor be prevented from providing that care to prevent the woman from losing her limb? He would, yes, but in full standard, the United States has not presented any real-world scenario where that kind of treatment was necessary. As Judge Van Dyck found in his opinion, setting aside the injunction after it was first entered, based on the Idaho Supreme Court and legislature's clarification of the law, every example the government has come up with so far is one that Idaho would allow a termination of the pregnancy because the woman's life would foreseeably be in danger. But you agree that the example that I just gave, the doctor would be out of luck if he treated the woman who would not lose her life but would lose, say, her leg. Is that right? Yes, Judge Miller, and that hypothetical situation – Judge Miller. Judge Smith, yes, Judge Smith. The hypothetical situation, which has not been stated or replicated in any of the government's expert reports, that there would be a clear difference there, yes. So can I ask you to turn to the merits of your study clause argument? Yes. Congress decides that they want to encourage domestic production of widgets, and so they create the – anybody can sign up for the National Widget Program, and once you do, they'll send you a check of $10,000 for every complaint widget that you produce. And suppose the state thinks that this is a really bad idea, and so they pass a law that it is a crime to participate in the National Widget Program. Is that state law preempted? It is not. The individual making widgets can choose not to take the money and comply with state law, in which case there's no conflict, or they can choose to take the money, produce the widget, and be prosecuted under state law. And that has to be the rule, or otherwise the United States could, for example, pay someone in California a gun shop to violate state gun laws or even to assassinate a state official, and the person who committed that crime would be immunized from state prosecution. And the United States Supreme Court has never understood the spending clause to grant that kind of extravagant authority. It would be one thing to say that a law like a federal statute is invalid because it exceeds Congress's power, but if it's valid, why under the supremacy clause does it not display a state law that would effectively prevent it from operating? Because it can be valid, and yet the person who engaged in the conduct, if they take the money, will still be subject to state civil and criminal laws. Federal government payment, a check, is not immunization from state law prosecution. Again, the Supreme Court has never understood it that way. The whole notion of the spending clause is that we're going to give you money as a carrot for you to do something in return, but that doesn't give the federal government the ability to shoulder out state criminal laws that prohibit assassination or that have restrictions on gun sellers. But normally we think that under the supremacy clause, valid federal legislation preempts state law that would frustrate its purpose or prevent it from having its full effect. So why is the spending clause legislation different from other kinds of federal legislation? To distinguish it from the commerce clause, that's the kind of legislation that applies to everywhere in all situations at all times. And when you're talking about spending clause, again, there's a deal. The government is saying, I want you to do this for me, and I'm going to give you money if you do it. When a state chooses not to participate in the contract, which is the situation here with Idaho and its public hospitals, it doesn't have any emergency rooms that take Medicare dollars, it hasn't accepted the terms of the deal. And if the U.S. Supreme Court has said that spending term clauses have to be unambiguous and they can't be used to coerce states to do anything, and a state says, no, I'm not going to do it, then that's the end of the game, the state's lost. Isn't that true when the state is the recipient of the funds? Well, that's a different situation, and there there's a question of whether the statutory scheme that goes to our cause of action question is so carefully reticulated that the government's only remedy, the federal government's only remedy is to withhold the dollars as opposed to bring a lawsuit. Let me ask you about that, because I want to make sure I understand your spending clause argument here, because it seems that you're arguing that the spending clause's clear notice requirement requires states knowingly consent to federal conditions on the front end before they're passed into law. And here I'm just trying to figure out how this works, because Idaho is not the recipient of the federal funds, but it seems like you're essentially saying Idaho should get the veto power over federal regulation, whatever it objects, and I'm not sure how this would work in practice if that's what you're saying. Would the governor or a representative of Idaho who has the power to buy the state have to sign off on all federal legislation directed toward private entities within Idaho? It seems to turn the supremacy clause a little bit on its head. Yeah, so I can be clear about the argument we're making. Madam Chief Judge, the clear conditions argument has to go to the merits. Assuming that Idaho could be bound by the Medicaid Act, even though it's not taking any of the dollars for its emergency rooms, then the federal government has to clearly state the conditions that it's applying before they can be exercised against the states. That's a merits question. Here we're talking about a state which is not participating in the program at all, and the state government or the U.S. government is entitled to contract with whoever it wants, but it can't violate state law in doing so, any more than – But doesn't the supremacy clause apply in that situation as well? Right, but the supremacy clause only applies when there's going to be a conflict between the laws, and there's no conflict if the individual in the state complying with state law chooses not to engage in the conduct and accept the money. Let me give you an example. So you have the Medicaid expansion and have an FIB for the civilians. If the federal government had invoked, say, commerce clause power in that situation, the United States Supreme Court would not have reached a different result because it was all about what was fair notice to the states and what did they agree to. None of the participating states could not be bound to a Medicaid expansion program that they did not want. So when you're talking about the commerce clause power, yes, the U.S. and Congress combined, everybody in the state does not have anything to say about that if there's a conflict. But when the government is doling out money in exchange for conduct, then the situation is different. They can't pay state residents to violate state law and immunize them from state criminal law. Can I ask you, you know, you treated them like they were distinct questions, their statement versus just the merits issue. It seems like, as a practical matter, is there some relationship between them today? Because you can come up with crazy hypotheticals. A person can come up with crazy hypotheticals and go, the federal government is paying this, and the state, you know, they clearly want this to happen. And the state, you know, comes in and says, we're going to criminalize if you do that for everything. But in that instance, it would be very clear what the government was doing. In the hypothetical, I was trying to think of a hypothetical where it wasn't very clear that the federal government was instructing, we are going to give you a subsidy to do this thing. It's not clear. It just seems to me like there's some practical relationship between the clarity. If it's not clear, then it seems like there's really not a problem. There's not this conflict. You're saying there's not a conflict because there's a way. But if it's not even clear that the federal government is selling them billboard widgets, you know, we just think the federal government might be selling them billboard widgets. It seems to me that the clear statement aspect of it has some work to do in how we interpret the federal government's requirement. Am I wrong on that? I think you're exactly right, Judge Van Dyke. I think it has aspects to both. With respect to our merits question, the fact that Congress did not make clear that EMPALA requires abortions in the emergency room is a reason why we would construe EMPALA to not include that requirement. But then on the front end, with respect to the spending clause, the fact that Congress has not been clear that abortions are required here makes it even less likely that a state which has not entered into the contract would somehow see its laws preempted when it doesn't participate in the program. So I think you're absolutely right that that has some purchase in both contexts. And because my time is already growing short, I just want to ask you a quick question. Is it an exercise in futility? You said the parade of horribles, none of those have occurred. You said every day that ISO can't have its law in effect, it's a terrible day. But none of the things that anyone's talked about have happened. A lot of things have changed on the ground. And we have a new administration. Why shouldn't we just send everything back to the district court and let the district court start with all the changes? For three reasons, Judge Callahan. First, we don't know what the new administration is going to do, and we don't wait in uncertain situations. Second, there is ongoing harm to Idaho, because although there's no conflict between our interpretation of the statute, the federal government, which has walked back against more concessions than they did at the Supreme Court, has a much broader understanding of what EMTALA requires. And finally, because none of the three legal issues that we present, spending clause, cause of action, and the merits, require any fact-finding whatsoever, I would like to reserve some time for rebuttal. But if you would prefer to keep asking questions, would you like me to proceed? You reserved your time. All right, I'll reserve my remaining time. Thank you. Thank you. Thank you. Good afternoon. May it please the Court, Taylor Meehan on behalf of the Idaho legislature. I'd like to start with the text for my portion of the argument. EMTALA puts a thumb on the scale for Idaho in this case. So Section F says, as a default rule, that state laws generally will not be preempted by EMTALA. And here, the United States has made no showing of a direct conflict to overcome that default rule. It beggars belief that there's a direct conflict between Idaho's Defense of Life Act and EMTALA, when the Idaho legislature has drawn the same line as Congress. The fact that five out of the nine Supreme Court justices have indicated that they see a conflict here between EMTALA and Idaho's statute and that Idaho's Supreme Court itself in the Planned Parenthood decision also seems to acknowledge a daylight between the two. Why shouldn't either of those sort of govern or at least instruct what we do here? Two responses, Judge Koh. The first is that I think the way to read Justice Barrett's concurring opinion is she actually thought that a dig was warranted in the case because she wasn't so sure there was any actual conflict. And EMTALA covered circumstances. Justice Alito and Justice Thomas very explicitly said there was daylight between the two. I think it's important to read that sentence in its whole context. And what Justice Alito is saying is in this one circumstance, pre-viability, pre-term rupture of memorandum, there might be a conflict as the government interprets EMTALA. And that's a key phrase there. As the government interprets EMTALA in its brief, it's different than what the government's witnesses said under penalty of perjury. So in the government's brief here, the government has said that in that circumstance of premature pre-viability rupture of membranes, that immediate abortion should be offered because of future risks, possible risks to her health. It's pretty explicit, though, that Justice Alito's defense that one of the differences is health versus life. And that's pretty. And with all due respect to Justice Alito, but more importantly, I don't think a side-by-side comparison of state law and federal law is the way to do the preemption analysis here because you cannot declare state law preemptive based on a hypothetical conflict. And when you look at the federal government's declaration, it's the federal government who has said it's taking Idaho law for what the Planned Parenthood decision says, that there actually probably isn't a conflict in that particular, the one example, that Justice Alito includes in his defense. I point you to paragraph 19 of Dr. Fletcher's declaration. And in Planned Parenthood, the Idaho Supreme Court looked at the definition of medical emergency in Idaho's six-week abortion ban, and that has the language, necessitate the immediate abortion of her pregnancy to avert her death or for which any delay will create serious risk of substantial and irreversible impairment of a major bodily function. And the Idaho Supreme Court looked at that medical emergency definition and said that there could be a difference between what's in EMTALA and what's in the total abortion ban, which is how they refer to the statute at issue here. And the district court and the government certainly said that that could happen. But what matters is whether the government has proved its burden to show an actual conflict. And if you look at the declarations, Dr. Fletcher for the government said it best. She said, after reviewing the legislature's witnesses' declarations, it seems the only disagreement between the physicians who testified in this case is the interpretation of Idaho law. They've all described the circumstances as life-threatening. So another way of thinking about it is that, you know, abortions required for health but in circumstances short of life is a null test, at least if you look at the declarations of the two witnesses. One way in which you could prevail is in showing that just as a record-based evidence matter, these two laws are actually overlapping and the same, but Justice Alito seemed to have a different view nonetheless. He favored your position essentially as a matter of law under the text of EMTALA. That's right. I think there's three ways for us to prevail. The second-clause argument would be one of them. So what I've been expecting would be the narrowest way, where if you actually do look at the declarations and you hold the United States with burden of proof, I think we prevail that way. But perhaps the clearest and simplest way to prevail is based on the text of EMTALA itself, as well as the Medicare Act. So I think there are four or five pieces of the text that I'd love to run through. The first would be subsection F, which, again, puts the thumb on the scale for Idaho. Before you do that, may I please just do this? I have read that you refer to this as an abortion mandate. In other words, what the government is asking. But you say they don't even mention abortion in EMTALA, and yet you don't talk about other treatments like blood transfusions, stitches, and other things that are clearly available to physicians. So why should EMTALA's failure to use the term abortion mean that that shouldn't be considered as a legitimate treatment option? I agree that EMTALA doesn't mention particular treatments, and when we're talking about what stabilizing treatment EMTALA might require, that doesn't free a hospital from not giving that stabilizing treatment. But here the question presented is slightly different. EMTALA doesn't mention abortion. It does mention on-board child. And given the subsection F's default rule, should we interpret EMTALA to require physicians to provide abortions that Idaho law prohibits? I'll take the example I used with your friend. You have a physician. A woman comes in to the emergency ward. The physician's a good-faith opinion. The woman, unless she has an abortion, is going to lose a leg. I asked your friend whether that would be a violation of Section 622 if I understood correctly. He said, yes, it would be. So here you have a physician who's going to lose his If they treat the person, the woman may lose her leg otherwise. You don't think that's in conflict with the purposes of EMTALA and a natural reading of it? I don't, Your Honor. So first a legal point, which is that while a hypothetical could show a hypothetical conflict or a possible speculative conflict, that's not sufficient for the preliminary injunction. Well, with respect, I think if I understand what you're saying, you're saying that the declarations on one side say one thing, the declarations on the other side say something else, therefore the government loses, but they're conflicting, right? Just the opposite, Your Honor. Let me clarify that. The only disagreement between the declarations, and this is in the government's declarant's own words, is what Idaho law allows and doesn't allow. Those declarations came in before the Planned Parenthood decision. We agree that the only disagreement is what Idaho law allows. And the Planned Parenthood decision says three things that are critically important and take out any disagreement, I think, between the government's witnesses and the legislature's witnesses, that all these circumstances are life-threatening. Here are the three things the Idaho legislature, or the Idaho Supreme Court says. First, they say that the exception for pregnancy termination, pre-viability necessary to preserve a life, is based on the good faith subjective judgment of that physician in the emergency room, based on the real-time facts known to them. But if they guess wrong and the prosecutor thinks that's not good faith, they get prosecuted and they lose their license, right? I really look close at page 1204 of the opinion, Your Honor, because the Idaho Supreme Court is going out of its way to say, we don't want the prosecutor second-guessing that. The prosecutor, and I forget the name of the prosecutor who said, and this was a he, he said he would prosecute if he determined that, in his judgment, the physician was not acting in good faith. I think the Idaho Supreme Court said, of course, you could question whether the judgment is in good faith. It's an abortion provided for a paper cut, right? We wouldn't expect a prosecutor to question that judgment. But if you look very closely at page 1204 of the opinion, the Idaho Supreme Court is declining to put any more standards on that good faith subjective requirement. Well, here's the thing, counsel, then, why don't you help them out? And you started the argument by saying what the government had conceded, but you conceded at the Supreme Court that pre-prom, for example, were within the things that were allowable under the statute. We absolutely did, Your Honor, and we did. And so my question is, has anything happened since that time? Has there been an initiative to amend the statute to add all those different conditions that are allowed to be performed by doctors in Idaho? No, Your Honor, and I think it actually relates to my answer to Judge Smith, which is the more you put in the statute, the more you start to limit the physician's good faith belief. But our witnesses, the legislature's witnesses, agreed with the government's witnesses, and Dr. Reynolds goes so far in paragraph 8 of her declaration to say that the failure to treat pre-prom as a life-threatening condition would be malpractice. What do we do with the fact, I think Judge Wendell brought this up, that in effect this turns a criminal statute on its head? It's the burden of the physician to show he was acting in good faith rather than the burden of the state to show beyond a reasonable doubt that he didn't have good faith. What do we do with that? I think that might have been true at the time of Judge Wendell's decision when the statute was still free to the permanent defenses, but now that the statute's in question, I think that that falls out of the case. So you don't think the burden is on the physician to stay together her career and possibly avoid some jail time?  If anything, the burden is on the prosecutor who's bound by the Idaho Supreme Court decision to decide to bring charges against a physician. The doctor's supposed to know that if it's not explicit. What's the standard of care here that's being provided that you seem to think that it's encompassed within what the Idaho Supreme Court did? Well, Your Honor, to be clear, the Idaho Defense of Life Act is a prohibition on criminal abortions that expressly extinguishes criminal abortions from necessary medical treatment. It's not a statute about emergency care. It's a statute that primarily prohibits elective criminal abortions. It's not about medical treatment. And that's why I think the legislature's witnesses' declarations are so important. Dr. French explains at the beginning of his declaration that he doesn't understand. Someone who's created a policy here in ERs and in Idaho and beyond, he doesn't see abortion as first-line medical treatment in emergency rooms. The problem is, you know, I've read the declarations that are provided, and some of the declarations are really concerning, especially for someone who lives in Washington, in eastern Washington specifically, has visited places like Staten Point and understands that their whole obstetrics department has closed down. So that this area in Staten Point, that's a place that some of us visit all the time, there are no services available for women who, let's say, decide or have a situation where they're bleeding out, and yet the service that would be needed is now gone from necessary. What do you do in that circumstance? Well, a couple of responses, Your Honor. First, I don't think control is the statute to solve that circumstance. Second, Dr. Reynolds said there's a nationwide shortage of OBs. And third, with respect to Intala specifically, if a patient is experiencing catastrophic bleeding, there's no disagreement that Idaho law allows treatment for them. This is not catastrophic counsel, but it's short of resulting in serious injury to the life of the woman. What do we do in that circumstance? Does she have to then rely on, hopefully, a working vehicle to drive across the border into Spokane, Washington in order to get services there? No, Your Honor. And I point you to Pages 415 of the legislative ER. I point you to Pages 417 to 418. I think Dr. French is speaking to exactly the circumstance that you're imagining. And he said when you have uncontrollable bleeding. We may not imagine that these declarations substantiate the increase in the number of Idahoans crossing the border to services in Washington, for example, which is the very thing that Congress was trying to avoid. They were trying to set a baseline level of care for the country, and this happens to be one of the services that is necessary under certain medical situations. The legislature's witnesses agree with that. The Idaho Supreme Court agrees with that. The Idaho Supreme Court's decision that you don't delay care, that you don't wait, contrary, for example, to some of the amicus brutus, until a woman is on death's door, that is the law in Idaho. And, again, if the legislature's witness said, if you're requiring that woman to bleed out in the emergency room, that's, in her words, a malpractice situation. Do you wait to get to that point? Absolutely not, Your Honor. How is that clear to the doctor? It's clear to the doctor because of the Planned Parenthood decision and the Supreme Court's decision. I think the Supreme Court's decision, RIV, makes clear that authoritative statement on Idaho law is binding here. There's no conflict in the declaration. But if I could, with my remaining time, EMTALA refers to the unborn child. It anticipates to use stabilizing treatment for the unborn child. And to say that EMTALA then speaks clearly in the opposite direction, that you must terminate that unborn child's life, I just don't think it's unambiguously clear under the Stemming Clause. I don't think it's clear enough under the Tenth Amendment, and I don't think it's clear enough under the presumption of preemption against preemption that EMTALA itself codifies. What language in 1395 BP would you point to to say that a medical procedure that violates state law can't be, isn't required by EMTALA? Is it the definition of stabilize, or is it IV? Whenever I think about EMTALA, I always start with subsection F. And subsection F is saying EMTALA is operating alongside state law unless there's a direct conflict. And so then I go and look for a direct conflict. And I think subsection E is where you go next, where you have the reference to unborn child, and then you also just have general references to such treatment. And given that reference, such treatment, plus subsection F, I'm convinced that EMTALA operates alongside state law. One way to think about it is that EMTALA is operating at a higher level of generality than state law allowable medical treatment. I do think that the ______. It does seem like in the statutory language that there is a conflict there because I'm looking at section E, the definition section, and it says absence of immediate medical attention could reasonably be expected to result in whereas the item of state law says necessary to prevent. So going back to the Chief Judge's question, there is a, you know, with at least with regard to PPROM and preeclampsia, there is a question of whether doctors would need to delay to get to the point of necessary to prevent that in order not to be subject to a two-year mandatory minimum state prison sentence, possibly up to five-year prison sentence, and to lose their license. I do agree that the statutes are written differently. But after the Planned Parenthood decision, I do not think you can read in a delay requirement or that there's any daylight. That's both based on the words that the Idaho Supreme Court used and then obviously the declaration. And if I could just end by saying, even if you disagree with me on what I've said, even if you don't read EMTALA the same way, the government has to run the table on the ambiguity question. You have to agree that EMTALA is unambiguously clear in the opposite direction and that it does require medical providers to provide abortions that Idaho prohibited and Congress won't pay for. And I just don't think the government is made by showing here and would ask that the preliminary injunction be vacated on those grounds. Thank you. Good afternoon. May it please the Court. Katherine Carroll on behalf of the United States. EMTALA requires that when a patient comes to a covered emergency room suffering from a medical emergency that threatens her life or her health, the hospital must provide stabilizing treatment. That is, the treatment that's necessary to meet a specified medical objective consistent with evidence-based clinical standards. And that is the objective of assuring, within reasonable medical probability, that the condition will not materially deteriorate upon the patient's discharge or transfer. Tragically, the record in this case amply supports the district court's conclusion that there are indeed some pregnancy-related emergencies where the only treatment sufficient to stabilize the condition is termination of the pregnancy. In those circumstances, EMTALA requires the hospital to offer the treatment. But Idaho law prohibits it unless the physician can conclude at that moment, in their subjective medical judgment, that providing the termination is necessary to prevent the patient's death. As Judge Coe pointed out, the Idaho Chief... There's a concern that your evidence is obsolete now because it was presented before the state legislature amended the statute, before the Idaho Supreme Court clarified the reach of the law, before the Supreme Court rule argument. Why is your evidence not obsolete now? So I guess a couple of points on that. First of all, I think the changes in the law that have come about as a result of both the Planned Parenthood decision and the Idaho legislature's amendments are not changes that eliminated the conflict and the conditions that our declarants describe, and I would refer in particular to the supplemental declarations of Drs. Cooper, Corrigan, and Fleischer. I think those situations all continue to arise in the gap between Idaho law and EMTALA. As we saw earlier this year during the time when the injunction was stayed and several patients indeed had to be airlifted out of Idaho because of the conflicts between Idaho law. And I think here, again, I agree with my friend that the Planned Parenthood decision is crucial here. And I would refer to pages 1196 and 1207 of the decision, where, as your Honor pointed out, the court explicitly contrasted the necessary-to-prevent-death exception with the broader medical emergency exception that had existed in another Idaho law. And the court recognized that that broader exception in the other law is, quote, substantially similar to EMTALA but does not appear in Section 18-622. I mean, that was true. That's true. The distinction between Idaho law and federal law really only becomes relevant if EMTALA has the capacity to say anything about Idaho law on the topic that we're talking about. And here we have a federal law that your argument is that it has essentially a federal medical standard of care. Where do you see that in the statute? So that is not our position. We read EMTALA to require the hospital to make an evidence-based reasonable medical judgment about what care is required, not in a one-size-fits-all way of particular conditions, but to look at the facts of a specific case and ask, what are this patient's conditions and symptoms, what is her personal risk factors, her medical history, and so on. But where does that come from in the statute? Several places, I think. First of all, the text defines stabilizing treatment with respect to an objective concrete care objective, which is to prevent material deterioration of the condition. In several places throughout the statute, and I'm looking at the definition of stabilize, the definition of emergency medical condition, and the provisions covering transfer, the statute repeatedly invokes references to reasonable medical judgment. And critically, in the procedure that Congress established for the enforcement and investigation of alleged violations, Congress again invokes those kinds of evidence-based clinical standards. The question is, whose medical judgments? Because your argument is that it's not the medical judgments of those in Idaho who have crafted the Idaho law that's before us. And one would wonder why, when the statute talks about control over the practice of medicine and the manner in which medical services are being provided, it's something that's reserved to the states. So we think that the definition of stabilizing care and the obligation to provide it are not defined by reference to state law. They're defined by reference to the physician in the hospital's reasonable medical judgment. Again, under the QIO program, and this is laid out not only in EMTALA, but in the provision that establishes the QIO review program, and that's at 42 U.S.C. 1320C-3. And it sets out that what Congress said, when there's a complaint alleging a violation of EMTALA, the process should proceed essentially as a peer review kind of process, where an expert physician who's a specialist in the implicated area of medicine will go in and talk to people to understand what decisions were made, what were the facts, the clinical facts on the ground, what judgment did you make, what diagnosis did you reach, what treatment did you determine was necessary, and the sort of guided, structured forms that guide this investigation, the way the inquiry throughout that process is, did you make reasonable clinical decisions? We think that's the standard that EMTALA invokes. It's very similar, actually, I think, to the Medicaid language that this court construed in Planned Parenthood versus EDLAC, which construed the free choice of provider language in Medicaid, which references qualified personnel. And the State of Arizona said, well, we're allowed to decide who's qualified, and this court held, no, we think the statute is better read to reference objective medical realities, like competent medical accessibility professional recognition. The process that you've just described, in your view, does it leave any space at all for law or regulation to come to bear? For state law in particular, yes. We think that in many cases, if probably most cases, EMTALA and state law harmoniously operate alongside each other. Maybe I can sort of explain how that works with our understanding of EMTALA. I'll do, I think, a follow-up to Judge Brez's question of where in the statute do we get that guidance, because what I understood you to say is based on these definitions, there's just basically a medical judgment or evidence-based standard. I think that that's probably true most of the time when we're talking about medical judgments, but my understanding of how this has always worked is that there's always sort of in the background legal regulation, licensing requirements, you know, oversight of the medical practice. So I don't understand when you're describing how you see how this works, where that comes to bear in this situation, and if you think it does, how you point to that in the text that we're working with. Yes. So a few responses to that. First of all, in EMTALA, Congress did agree that subsection F is an important provision here, and it makes clear that as long as state law does not directly conflict with EMTALA, that state law can apply, but where there is a direct conflict, then state law is preempted, and this Court construed that language in Draper to make clear that impossibility of an optional preemption is not what the standard of care is. And so if your argument is the standard of care is a medical judgment, then I'm not hearing. Does that categorically set aside Idaho's standard? In most cases, it will not. So, you know, my friends have brought up the example, for instance, of, you know, sort of situations where, you know, the blood bank is empty or, you know, thinking about organ transplant kinds of situations. We think those are kinds of cases where, first of all, no doctor would ever conclude that it's consistent with evidence-based accepted clinical practices to, you know, go sort of harvest organs from people we knew. This is important because I didn't really see where you responded to those hypotheticals. Let's use the organ thing. Let's just say there's an organ sitting there. It's been, ethically, the way it was harvested was not ethical. You know, make your future dystopian sci-fi movie, right? So let's just stipulate. I don't want you to run away from the hypothetical. So there's a perfectly good organ sitting there, but it was harvested unethically, and a state has made a judgment that we are not going to allow unethically harvested organs to be used in transplants. But it seems to me, under your standard, if that doctor thought, you know, we've got the organ sitting there, it's just going to go bad, like, we should put this in. That's how we're going to stabilize this patient in a reasonable medical judgment. If the organ hadn't been unethically harvested, we would totally use it. It's not any sort of scientific thing that's driving it. It's purely an ethical consideration that was made by the state's regulations. Under your test, it seems to me they would have to – that your view of entail is that it would preempt the state's law to say you cannot use unethically organs that were harvested, or whatever you want to call it, unethically. Yes, and to be very clear, we don't think state law is preempted unless it directly conflicts by prohibiting – Wait a minute. So if you're to say that this is not direct, that it goes back to – it's not direct enough, then I think it's exactly what Judge Forrest and Judge Metz were just asking, is that how is the cytotoxic that you're finding direct enough? Because it seems like it's very similar. Maybe it would help to unpack a little bit how we understand all of this to work and what we think the respective roles of federal and state law here are. Under EMTALA, again, we think the stabilizing treatment requires – that's read to us to mean a judgment based on evidence-based clinical standards about what treatment is necessary to meet the specific objectives that the statute sets, i.e., to prevent material deterioration of the condition. The physician is going to make a judgment about, based on those facts, what is that stabilizing treatment. Once the stabilizing treatment is identified, EMTALA requires the hospital to offer it if it's available within the staff and facilities of the hospital. I think a lot of the hypotheticals that we've heard are addressed by that requirement because I don't think that anybody would think that illegally procured organs or the blood of patients – It was illegally procured, but we were just about ready to put it in, and we just discovered that it was illegally procured. And it's clear that that violates state law and that you cannot use illegally procured organs. But I have a problem as a physician because I'm sitting there, and I know this will help the person's health. And so you're saying EMTALA preempts that, I think, if I'm following your logic. So it's a little hard. I understand you don't want me to cite the hypothetical. It's a little hard to engage with this particular one because organ transplants do not occur in emergency rooms, and EMTALA is an emergency room statute. But to take the question a little bit, a level up in generality, we think that state laws can and do routinely apply to the safe and effective provision of medical treatment so long as they're not taking off the table the only treatment that will suffice to stabilize the medical physician. I don't know if this is getting out of me. We'll take away the hypothetical and just have you address this. There are some treatments that a state might ban that would actually be a really effective treatment, but again, they ban it for ethical reasons, right? These were some examples given, taking an organ from one person against their will. And so do you think that a state's ethical concerns or anybody's ethical concerns have any role to play in what counts as a reasonable medical judgment? So, again, we think that identifying the stabilizing treatment is a medical question. And then EMTALA provides that it has some ethics built into it. So that's my question. Can ethics be built into that? Because if ethics can't be built into it, then you back edge who gets to decide the ethical question. And then the question is, why can't the state be the one that decides it? If the results of the states, whether it's an ethical judgment, whatever the basis of the judgment is, if the result of their judgment is that a hospital covered by Medicare cannot provide the only treatment that would suffice to ensure that the patient's medical emergency will not continue to deteriorate, then we think that's preemptive. The circumstances we're talking about here, the reason why this all sounds quite outlandish is because it's actually highly unusual for the sort of background state law principles that do operate here ever to say a particular treatment that's clinically indicated that doctors would all agree is the necessary treatment in particular circumstances. It's just unavailable. I think to the extent on the rare situations where that does come up, I think the Fourth Circuit's decision in matter of ABK is an example where the court said, yes, if to the extent the state has said you cannot provide the one and only treatment that will stabilize this patient's condition, then that is preemptive. It's a narrow... I think you still haven't really heard an answer to my question, which is sometimes there may be two treatments, but one is off the table because of ethical, or there might be one treatment, but that's off the table because of ethical considerations. Can ethical considerations play a role in determining whether or not that one and only treatment, is the answer yes or no on that? I think the answer is yes, so long as the hospital can still comply with its obligation under EMTALA. If we're in the situation where there are two potential stabilizing treatments and the state has taken one off the table, as in any preemption case, you would ask, can I still comply with state law and with EMTALA? And the answer is yes, because I still have a treatment available that's appropriate for this patient that would suffice to stabilize the patient's condition. Before moving on to the spending clause, I just wanted to ask, so Ms. Meehan had said that there is no daylight between the passing of the amendments and the Idaho Supreme Court case, that there's really no daylight between serious injury to the pregnant woman or possible death. Is that your view as well, or do you? No, it's not our view, and we don't understand it to be the view of the Idaho Supreme Court either, which, again, did recognize the gap on the face of the two laws between what Idaho allows and what EMTALA requires. And just a note to ask about, you know, if, to the extent the legislature didn't intend to prohibit medically necessary termination treatment that doesn't pose a risk of death but does pose a risk of serious impairment of the patient's health, why not amend the law to reflect that? And I think it's notable that Idaho did amend this law after Planned Parenthood. It made certain changes, but notwithstanding the fact that the Idaho Supreme Court had pointed out this gap between the necessary to prevent death exception and the standards set in EMTALA, it did not make any changes to the scope of that definition. And the declarations make clear that this is a gap that exists in the real world, in real cases, where real people are coming into the emergency room facing not only the tragic loss of their pregnancy but also the potential to permanently lose their fertility and any possibility of ever becoming pregnant again in the future, the possibility of kidney damage leading to lifelong dialysis, the possibility of limb amputation judgment. The declarations, and, again, I'm looking in particular at Drs. Cooper, Corrigan, and Fleischer in the supplemental declarations, they illustrate that these are real cases. They are thankfully rare, but they are real, and this is a narrow and critical conflict. Idaho law can operate like other state laws alongside EMTALA in any number of cases, but in this narrow critical space where it does conflict and where it does lead to situations like the airlift that we saw during the state earlier this year, that is conflict, and it is not the regulation of the practice of medicine or the regulation of the manner in which medical services are provided. So, again, because we think EMTALA looks to the medical judgment made by the physician and the hospital in the situation. It's not mandating the particular treatment. It's leaving space for the physician to identify in their practice of medicine what is the clinically acceptable treatment. So we don't think that's a regulation of medicine to the extent that EMTALA and, indeed, the Medicare Act and all of its conditions of participation in general touch on the manner in which medical care is provided. Of course, that's part and parcel of the whole point of EMTALA, which was to say prior to its enactment you have this problem of patient dumping, and largely because many states did not recognize a new use of treatment. And so the whole point of the statute was to come in and say we're going to displace that state law judgment and impose a requirement that hospitals provide stabilizing treatment. And as the Supreme Court pointed out in the CMS vaccine case, Biden versus Missouri, that is like any number of other conditions of participation in Medicare, which in many respects do influence how medicine is practiced. But the appellant's reading of Section 1395 and the idea that it infringes on or attempts to control the practice of medicine would render that entire scheme unlawful in the Supreme Court. And I think you're making progress towards the spending clause issues because it still seems that, you know, even if you have your argument on it, you have to still show that it's unambiguous to the point that it would be a clear condition under spending clause legislation. So how do you think you – I take it you agree you have to meet that standard. We have to meet the standard to show that this is valid spending clause legislation, including that it was clear to hospitals that accept Medicare funding that they would be required, at the condition of that, to comply with EMTALA. In this case, it is – But not just comply with EMTALA. Don't you think it has to be a level bound to comply with the level of medical care you're advocating here? Because it's clear that one has to comply with EMTALA. It's sort of obvious. But we're talking about something much more specific to provide abortions in certain specific instances in which EMTALA would disallow them. So, first of all, I'm not sure that the Pennhurst decision does require that level of specificity, but even if it did, I think the record here from the declarations from the amicus brief and, frankly, even from the admissions that Pellis made in their answers in the district court, reveal that, in fact, the hospital did understand what this condition meant and voluntarily agreed to it. And it's been a fairly widely accepted, understood, you know, interpretation of EMTALA to say that it does, in fact, in some narrow circumstances require pregnancy termination. And we've cited evidence from HHS's understanding, the medical community's understanding, hospital came in court long before the decision in DOG in which, and these are cited at pages 18 to 20 of our brief, illustrating that people did understand EMTALA to, in fact, require that. Now, with respect to the spending clause, I want to address the merits of the point, but just to your point, I do think it's important to note that the argument that this court is hearing now was not raised until this case got to the Supreme Court. And to that point, I want to get the government's position. Your friend on the other side says that this court, because it's a question of pure law from his perspective, we should decide that. Is it the government's position that no, this should be sent back to Judge Wendell to consider this in the first instance, the spending clause issue? We think Judge Wendell should have the opportunity to consider it in the first instance for a few reasons. First of all, you know, taking it from the Supreme Court, we understand that to be what they were contemplating when they said the lower court, plural, should have the opportunity to consider this. Judge Wendell had in front of him, as you noted, a footnote referencing the question of whether this was valid spending legislation in the first place. But the argument we're hearing now, it's been a moving target. The argument they're making now, as I understand it, even assuming this is valid spending legislation, nonetheless, it can't preempt state law. We think that's wrong for a host of reasons. The Supreme Court has repeatedly recognized spending legislation to be preemptive. But that is an argument that has not been made in this litigation until the case got to the Supreme Court. And the reason why. If I could just jump in real quick. This is the question I've been waiting to ask. So if that is the case, could we affirm, because this whole argument has been like this is a permanent injunction. It's not. This is a preliminary injunction case. All of the arguments that we've heard today can be made to Judge Wendell when you have full discovery and a full trial. Correct? I think that's absolutely correct. The question of affirming the preliminary injunction is easily answered by the fact that the record before Judge Wendell was adequate to support his finding. I would have thought at that time, and with respect to the new arguments that have been developed, I don't think the Court needs to grapple with them to affirm the P.I., and partly that's because although in some sense it is a purely legal question, I think the parameters of the argument, as I understand it, actually do intersect with the claims they're now making that notwithstanding the tax and the Idaho Supreme Court decision, Idaho law, in fact, doesn't pose a conflict here. Because as I understand their argument on the spending clause issue, they're saying even though Idaho didn't accept funds and is not being required to comply with any conditions, somehow they have a veto power over an exercise of spending authority that would conflict with their law. But if their whole submission is that there is no conflict and they intend to pursue that argument in front of Judge Wendell, then I'm not sure what comes of their spending clause argument. Because if you have a situation where there is no interference with the state's prerogative to enforce a conflicting law, then I don't see any basis whatsoever for even trying to distinguish the litany of Supreme Court cases we've identified in which the Court has held that spending clause legislation does preempt conflicting state laws. I could jump in just again procedurally. So we're reviewing the preliminary injunction, correct? The piece of discretion standard. All of the stuff we've been arguing about today will be argued again to the district court if the United States government still decides it's going to pursue a permanent injunction, correct? That's correct. And so for that reason, we think that the most straightforward course here is to affirm the preliminary injunction and to the extent of how us want to seek to modify or vacate the injunction or simply want to proceed on summary judgment by all of that, they can do all of that. So, yes, that's ours. I mean, of course, we have a legislation. We could also vacate and send it all back, too. There's no ground for vacating the injunction, though. Well, I'm just saying we could. Okay. I mean, that's not what you're asking for, but that is an option. That is on the list of potential dispositions in an appeal from a preliminary injunction, yes, but we think it's not available here for several reasons. First of all, we don't know what those reasons are. I'd like to hear your reasons. Well, thank you, because I think we've talked a lot about the merits issues here and the likelihood of success that I think we amply established by putting in the declaration, even in light of the changes that have happened in Idaho law. But I think I don't want to lose sight of the irreparable harm situation that led the district court to impose the preliminary injunction here, and this, again, goes to the fact that we are talking here about real people and real lives in real tragic circumstances. And the implication of appellants' position of their reading of EMTALA, that it can never under any circumstances mandate termination of a pregnancy as an appropriate stabilizing treatment, is that a state could pass a law prohibiting termination of a pregnancy in any circumstance, even when the patient is literally on death's door. And in their view, EMTALA would say nothing about that, and the United States government would have no power, no cause of action, no constitutional authority to speak up and do anything about that, even though Congress made a policy judgment here that in those circumstances, emergency medical care must be provided, or at least offered. I see I'm running low on my time. If there's any other issues that the court would like to touch on, I think we've touched on a lot of them. All right. Thank you very much. Thank you. May it please the Court, Lindsay Harrison of the House of Amicus, St. Luke's Health System. The conflict between EMTALA and Idaho law is not hypothetical, and we know that's the case because when the injunction was stayed for a matter of months, St. Luke's was put in the position of having to airlift six patients to neighboring states so that they would have the full range of stabilizing medical care available to them. And if the injunction were vacated, we would be returned to that state. And I can tell you from having spoken with doctors in Idaho that it is a horrible situation to put them in because they are faced with a conflict between complying with their federal obligation. So, you know, in the briefing, there's some disagreement about exactly what they're airlifting for. My understanding is that it sounded like one of them actually delivered babies. And, you know, I'm from Montana originally. A lot of people get airlifted out of Montana, and I'm assuming Idaho is similar, because they're in smaller states. They don't have the capability. So I just want to make sure how much of this airlifting is because of something that they just don't provide, and they can get better. You know, in Montana, they go to Salt Lake all the time, as I recall. Maybe the only answer is probably Salt Lake. Thank you, Your Honor. So these six patients were airlifted only because the hospital was unable to comply with EMTALA because of this Idaho statute. So five of the patients experienced PPROM, and one of the patients had preeclampsia. And I can talk through some of the details. I thought my understanding was that that was part of the agreement that the Supreme Court noted, was sort of the agreement that nobody's agreeing that those things can be treated by taking the life of a poor child. So the problem is that PPROM, for example, is not always fatal. As you said, one of the patients ultimately was able to deliver, fortunately, twins who had PPROM. And for that reason, the physician treating that patient could not say that termination was necessary to prevent the death of the mother. So it wasn't, right? Exactly right. And it isn't always. And the problem with the confluence between the two... Your argument is if the mother wants to kill the baby even though it's not necessary to prevent, then they have to be airlifted. So the airlifting was occurring because what happens is the patient would come in with, let's say, an infection. The membranes were ruptured, and there's signs of infection, elevated white blood cells, fever, and so on. The physician said, I would recommend at this point terminating because the fetus is 19 weeks. It's not going to be viable, although I do detect a heartbeat at this moment. And the problem is I cannot say right now that termination is necessary to prevent your death. Under Idaho law, I would be subjected to criminal prosecution if I were to terminate your pregnancy, but you should be transferred to a hospital right now where the full range of stabilizing care is available to you. And if the injunction were in place, I would actually be able to provide that care to you, but I can't convey to us in the statute the reference to unborn children, the fact that it talks about stabilizing both the mother and the unborn child, but it doesn't really tell you how to balance those two stabilizations if there's possible dissonance between the two. So two things, Your Honor. One is our interpretation is the same as the United States, that the obligation to provide stabilizing care when it's to the individual, and the individual in that situation is the mother. But it says to both, though. Well, it says to the individual, and it does reference the unborn child. The other point I would make is that in most of these situations, I won't ask for the government, but your position is that there is no obligation to stabilize an unborn child. Like let's assume that the mother was not at risk, but she came in, and the child is at risk. There is no obligation under EMTALA to stabilize the unborn child. So they could just carry the mom out and say, well, that's the way that you sort of have to get used to. No, the obligation to treat the individual doesn't go away because the damage or the risk to the unborn child in that situation. I think that's what Congress was trying to do in amending the statute. The important thing to understand here, though, is in almost all of these scenarios, there is no stabilizing care that is available that can save a fetus where the mother has experienced premature rupture of her membranes. In other words, there is no stabilizing care that could be provided because there's not going to be sufficient fluid for the fetus to develop into a baby. And these are occurring at 19 weeks, 20 weeks. It's not a viable fetus. There's a heartbeat, so the Idaho law makes that crime determinate, but it's not a situation where the fetus is going to develop and be able to be delivered. And if the fetus can develop and be delivered, that would be what the hospital would do in that situation. The Idaho Supreme Court decision is sort of making clear that in that situation where the unborn child is not viable, that Idaho's law doesn't criminalize that. That's right, Your Honor, because the statute says what it says. The court in that case didn't say that if there's a heartbeat, but eventually the fetus is going to pass. That's right, that the doctor is absolved from criminal risk in that situation. So if the next administration does not pursue this litigation, where does that leave your client? Well, my client would either have to, for any case of its own, intervene or would be faced with the circumstance when the injunction was paid, unless the court finds for some reason that the injunction can endure. But I agree that that's a troubling scenario in front of us. Can you clarify? So the unborn child language was added in the 1989 amendment to EMTALA, and it was responding to situations where the hospitals were turning away patients where the fetus but not the woman health was in danger. And so the statute does discuss, you know, the risk to the individual and, in the case of labor, to the unborn child of three kinds. And then one says raising the health of the individual or, with respect to a pregnant woman, the health of the woman or her unborn child. So I don't see in the statutory text the and language that's been referred in some of the questions to you. So it seems like the statutory text is consistent with that legislative history of wanting to address the situation where patients were being turned away and where the fetus but not the woman health was in danger. I agree with you, Your Honor. Yes. I don't really see how that follows, though, from the text of the statute, because when you read it, it talks about placing the health of the individual or, with respect to a pregnant woman, the health of the woman or her unborn child. Equally, the obligation runs to both. And the question would be, how do you differentiate between the two? If there's a medical need to prioritize one over the other, it's an extremely difficult question. The real question is whether the statute has anything to say about that question or whether it gets all the statistics. So we think the statute does require providing stabilizing care where it can prevent material deterioration of the condition. In the set of cases where these two laws conflict, in general, the stabilizing care can stop material deterioration of the mother's condition, but it can't do anything for the fetus because the membranes are ruptured and the fetus is not going to survive. Thank you. Thank you. I'd like to address two matters in rebuttal. The first is to address a question that Judges Forrest, Miller, Brass, and Van Dyke raised, which is who decides what treatment can be provided. And that's a legal question that doesn't require any factual development. And there's seven things that you should look at. First, Section 1395, the Medicare Act's very first provision, forbids the federal government from controlling the practice of medicine. Judge Brass, I believe you made that point. Second, 1395, WB1A says that you must provide treatment available at the hospital. If state law prohibits something, it's not available there. Third, Section 1320, small c. Your co-counsel ended with the fact that the ambiguity was spotless. And I'm looking at the Affordable Care Act. It was enacted 2010, so long before DAWG. And in the section that is exclusively about abortion, the sections are state-outbound of abortion coverage, special privileges relating to coverage of abortion services, voluntary choice of coverage of abortion services. It's all about abortion. And the last subsection says, nothing in this Act shall be construed to relieve any health care provider from providing emergency services as required by state or federal law, popularly known as EMTALA, including Section 1867 of the Social Security Act. So if there's an entire section that is exclusively about abortion, and it ends with the language, nothing in the Act shall be construed to relieve any provider from providing emergency services consistent with EMTALA. Where is the ambiguity here? Isn't that consistent with evidence the hospitals and physicians understood that in a narrow set of circumstances, termination of pregnancy might be necessary? No, Judge Copey, that subsection c of that same section you're looking at says that we should not construe the Affordable Care Act to preempt state laws about abortion procedure requirements. For example, that you can't perform an abortion unless the mother's life is in danger. That directly addresses that. I could finish just the list of reasons, saying we decide. Section 1320, small c, dash a6, says that EMTALA is enforced in conformity with state norms of care, not Dr.'s personal judgment, as my friend suggested. Every single circuit, all one through 11, says that. I don't think you were lost on that. Your best answer to Judge Owen's question, which is why shouldn't we just send this all back to Judge Wendell? For a couple of reasons. First, every day that the injunction is placed, it harms Idaho's sovereignty, it harms women, and it harms the very unborn children that Idaho law and EMTALA are both supposed to protect. That whole discussion about the colloquy about the unborn child, EMTALA is supposed to be protecting them, but this injunction prevents that from happening. So waiting is untenable. In addition to that, the spending clause question, the positive action question, and the interpretation of EMTALA are all legal questions. We don't need actual development. We don't need Judge Wendell to consider any of this. It's here before you now. You should decide it. If I could just briefly finish sticking through the questions with Madam Chief Judge. How many more questions do you have? We have, what, one, two, three, four. I just have three more. You're two minutes. You can use your 45 seconds.  Thank you. 42 CFR 482.11C, the government's own regulation, says that hospitals must assure their personnel are licensed or meet other applicable standards required by state or local law. That includes the ethic obligations that Judge Van Dyke was talking about. The CMS state operations manual, which they point to, it says, available in the statute means the scope of the doctor's professional license. Again, Judge Van Dyke, that's the point you were making. They give us 115,000 examples where a college is enforced against hospitals and doctors, not a single one involves a hospital cited for not providing treatment that state law prohibits. In fact, that should be dispositive. And then finally, with respect to that or Judge Coe in Section 1395BDE1A1, this is defining medical condition for purposes of WBDE1A to stabilize the medical condition. And then it defines that medical condition with respect to an individual as including the woman or her unborn child in that context, as Judge Bess was indicating, or me and Dan. So, Jody, very much. Thank you, Your Honors. I really appreciate it. I want to take a moment and thank you, Mr. Burge and Ms. Behan, Ms. Carroll and Ms. Harrison. I know this is a very difficult and challenging case and really appreciate very much the arguments presented here today. And I want to express my gratitude to you. Thank you. We are adjourned. The case of the United States of America v. Idaho is submitted. We are adjourned. All rise.
judges: MURGUIA, GOULD, CALLAHAN, M. SMITH, OWENS, MILLER, BRESS, FORREST, VANDYKE, KOH, MENDOZA